10-235(L)
*Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2010

(Argued: December 8, 2010) (Decided: April 6, 2012)

Docket Nos. 10-235(L), 10-251(CON), 10-767(CON), 10-1190(CON)

DISABILITY ADVOCATES, INC., and UNITED STATES OF AMERICA,

    *Plaintiffs-Appellees*,

        v.

NEW YORK COALITION FOR QUALITY ASSISTED LIVING, INC.,

    *Movant-Appellant*,

ANDREW M. CUOMO, in his official capacity as Governor of the State of New York, NIRAV R. SHAH, in his official capacity as Commissioner of the New York State Department of Health, MICHAEL F. HOGAN, in his official capacity as Commissioner of the New York State Department of Mental Health, NEW YORK STATE DEPARTMENT OF HEALTH, NEW YORK STATE OFFICE OF MENTAL HEALTH,

    *Defendants-Appellants*,

EMPIRE STATE ASSOCIATION OF ASSISTED LIVING,

    *Movant*.[*]

Before: CABRANES and PARKER, *Circuit Judges*, and KORMAN, *District Judge*.[**]

———————

      Appeal from a March 1, 2010 judgment and remedial order of the United States District Court for the Eastern District of New York (Nicholas G. Garaufis, *Judge*). The District Court ordered the Governor of the State of New York and various state commissioners and agencies (the "State") to make certain modifications to the State's mental health system to ensure compliance with 28 C.F.R. § 35.130(d)—the so-called "integration mandate" of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. We

---

[*] The Clerk of the Court is directed to amend the official caption of this action to conform to the caption listed above.

[**] The Honorable Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

hold that plaintiff Disability Advocates, Inc. ("DAI"), a nonprofit organization contracted to provide services to New York's Protection and Advocacy System under the Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq.*, lacks standing under Article III of the United States Constitution to bring this claim. We also hold that the intervention of the United States after the liability phase of the litigation had concluded was insufficient to cure the jurisdictional defect created by DAI's lack of standing. We therefore vacate the judgment and remedial order of the District Court and dismiss the action for want of jurisdiction.

> PATRICIA A. MILLETT (Steven M. Pesner, Robert H. Pees, James P. Chou, and Christopher M. Egleson, *on the brief*), Akin Gump Strauss Hauer & Feld LLP, Washington DC, *for Movant-Appellant New York State Coalition for Quality Assisted Living*.
>
> BARBARA D. UNDERWOOD, Solicitor General of the State of New York (Andrew M. Cuomo, Attorney General, Benjamin Gutman, Deputy Solicitor General, Cecilia C. Chang, Laura R. Johnson, Steven C. Wu, Assistant Solicitors General, *on the brief*), New York, NY, *for New York State Defendants-Appellants*.
>
> ANDREW G. GORDON (Julie E. Fink, Geoffrey Chepiga, Elizabeth Seidlin-Bernstein, Lindsey Weinstock, and Francine Murray, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY; Cliff Zucker (Timothy A. Clune, *on the brief*) Disability Advocates, Inc., Albany, NY; Ira A. Burnim, Bazelon Center for Mental Health Law, Washington, DC; Mara A. Kuns, Urban Justice Center, New York, NY; Roger Bearden (Aditi Koethekar, *on the brief*), New York Lawyers for the Public Interest, New York, NY; and Jeannette Zelhof (Jota Borgmann, *on the brief*), MFY Legal Services, Inc., New York, NY, *for Plaintiff-Appellee Disability Advocates, Inc.*
>
> SAMUEL R. BAGENSTOS, Principal Deputy Assistant Attorney General (Thomas E. Perez, Assistant Attorney General, Jessica Dunsay Silver and Terese Kwon, Attorneys, *on the brief*), Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, *for Plaintiff-Appellee United States of America*.
>
> Hugh Barber, Assistant Attorney General of Connecticut (*on behalf of* Richard Blumenthal, Attorney General of Connecticut, Dustin McDaniel, Attorney General of Arkansas, Robert E. Cooper, Jr., Attorney General of Tennessee, Mark L. Shurtleff, Attorney General of Utah, Bruce A. Salzbury, Attorney General of Wyoming), Hartford, CT, *for* amici curiae *States of Connecticut, Arkansas, Tennessee, Utah and Wyoming, in support of New York State Appellants*.

Christopher Murray (Matthew F. Didora, *on the brief*), Ruskin Moscou Faltischek, PC, Uniondale, NY, *for* amici curiae *Americare Certified Special Services, Inc. et al., in support of Appellants.*

David T. Luntz (Lori A. Sievers, *on the brief*), Hinman Straub, PC, Albany, NY, *for Movant Empire State Association of Assisted Living, in support of Appellants.*

Jordan W. Siev (Christopher A. Lynch, Cameron G. Van Tassell and David J. De Jesus, *on the brief*), Reed Smith LLP, New York, NY, *for* amicus curiae *Families of Current Adult Home Residents, in support of Appellants.*

Carla Christofferson (Justine M Daniels and Christopher A. Adams, *on the brief*), O'Melveny & Myers LLP, Los Angeles, CA, *for* amici curiae *American Association of Community Psychiatrists et al., in support of Appellees.*

Steven J. Schwartz (Mollie Richardson, *on the brief*), Center for Public Representation, Northampton, MA; and Robert J. Alessi (Gregory G. Nickson and Jeffrey D. Kuhn, *on the brief*), Dewey & LeBoeuf LLP, Albany, NY, *for* amici curiae *Dick Thornburgh (former United States Attorney General) and 30 former state mental health commissioners, in support of Appellees.*

Elizabeth B. McCallum, Howrey LLP, Washington, DC, *for* amici curiae *C.C. et al. (current and former residents of Adult Homes), in support of Appellees.*

Antony L. Ryan (Rebecca R. Silber and Alejandro H. Cruz), Cravath Swaine & Moore LLP, New York, NY, *for* amici curiae *The National Disability Rights Network et al., in support of Appellee Disability Advocates.*

Peter K. Vigeland (Michael Bongiorno, David F. Olsky, Omar Kahn, Natalie Rastin, Leizel A. Ching, *on the brief*), Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, *for* amici curiae *The Coalition of Institutionalized Aged and Disabled et al., in support of Appellees.*

JOSÉ A. CABRANES, *Circuit Judge*:

The question presented is whether plaintiff Disability Advocates, Inc. ("DAI")—a private nonprofit organization contracted to provide services to New York State's protection and advocacy

3

("P&A") system under the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. § 10801 *et seq.*—has standing to sue various state agencies and officials on behalf of certain individuals with mental illness residing in New York City for an alleged violation of the "integration mandate" of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

We conclude that because DAI does not have the "indicia of membership" required of non-membership organizations for "associational standing," *see Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977), DAI fails to satisfy the standing requirements under Article III of the United States Constitution as interpreted by the Supreme Court.

Because DAI lacks standing, we must also decide whether the intervention of the United States—which occurred after the determination of liability by the United States District Court for the Eastern District of New York (Nicholas G. Garaufis, *Judge*) but before the imposition of a remedy—was sufficient to cure the jurisdictional defect that would have barred the District Court from hearing the suit as originally brought. We hold that in the circumstances presented here it was not sufficient. We therefore vacate the March 1, 2010 judgment and remedial order of the District Court and dismiss the action for want of jurisdiction.

## BACKGROUND

### A. The PAIMI

In 1986, Congress enacted PAIMI[1] in order to "ensure that the rights of individuals with mental illness are protected" and to "assist States to establish and operate a protection and advocacy

---

[1] As we have previously explained, PAIMI was originally enacted

> as the "Protection and Advocacy for Mentally Ill Individuals Act of 1986," Pub. L. No. 99-319, 100 Stat. 478 (May 23, 1986), and was commonly referred to by the acronym "PAMII." *See, e.g.*, *Ctr. for Legal Advocacy v. Hammons*, 323 F.3d 1262, 1263 (10th Cir. 2003). In 1991, amendments to the Act substituted "individuals with mental illness" for "mentally ill individuals" wherever it appeared in the Act. *See* Pub. L. No. 102-173, § 10(2), 105 Stat. 1217, 1219 (Nov. 27, 1991). The short title,

system for individuals with mental illness which will . . . protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes." 42 U.S.C. §§ 10801(b)(1), (b)(2)(A).[2] In line with these objectives, PAIMI conditions certain federal funding for states on the establishment of protection and advocacy ("P&A") systems. 42 U.S.C. § 10803(2)(A). The designated P&A system may be either an independent state agency or a private entity. 42 U.S.C. § 15044(a), *incorporated by reference in* 42 U.S.C. § 10802(2). In turn, P&A systems are authorized to "pursue . . . legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." 42 U.S.C. § 10805(a)(1)(B).

---

        however, remained unchanged until 2000, when Congress amended the short title so that the Act would be known by its current name, the "Protection and Advocacy for Individuals with Mental Illness Act," or "PAIMI." *See* Pub. L. No. 106-310, 114 Stat. 1101, 1193-94 (Oct. 17, 2000).

*Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 464 F.3d 229, 233 n.1 (2d Cir. 2006). To avoid confusion, we refer to the Act exclusively by its current acronym, PAIMI.

[2] The term "individual with mental illness" is defined under PAIMI to mean any person

> (A) who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State; and
>
> (B)(i)(I) who is an inpatient or resident in a facility rendering care or treatment, even if the whereabouts of such inpatient or resident are unknown;
>
> (II) who is in the process of being admitted to a facility rendering care or treatment, including persons being transported to such a facility; or
>
> (III) who is involuntarily confined in a municipal detention facility for reasons other than serving a sentence resulting from conviction for a criminal offense; or
>
> (ii) who satisfies the requirements of subparagraph (A) and lives in a community setting, including their own home.

42 U.S.C. § 10802(4). 42 U.S.C. § 10804(d) modifies the definition under certain circumstances for individuals with mental illness as defined under § 10802(4)(B)(i)(III). 42 U.S.C. 10804(d) ("The definition of 'individual with a mental illness' contained in section 10802(4)(B)(iii) of this title shall apply . . . only if the total allotment under this title for any fiscal year is $30,000,000 or more."). None of the parties contend that § 10804(d) is applicable here.

5

New York has designated the Commission on Quality of Care and Advocacy for Persons with Disabilities ("CQCAPD") as the State's P&A system for persons with mental illness pursuant to PAIMI, 42 U.S.C. § 10821.[3] *See* N.Y. Mental Hyg. Law § 45.07(p)[4]; 42 U.S.C. § 10821. In 1989, CQCAPD entered into a contract with DAI as permitted by 42 U.S.C. § 10804[5] and New York Mental Hygiene Law § 45.07(i).[6] *See Disability Advocates, Inc. v. Pataki*, No. 03-cv-3209 (NGG), Zucker Aff. ¶ 6, Docket No. 205 (E.D.N.Y. Dec. 3, 2007) ("Zucker Aff.").[7] That contract "designates DAI as an authorized PAIMI agency and . . . authorizes DAI to provide protection and advocacy services to individuals with mental illness throughout the state." *Id.*

### B. Procedural History

On July 1, 2003, DAI initiated this action by filing suit against the Governor of the State of New York, the New York State Department of Health, the New York State Department of Mental Health, and the commissioners of those two agencies (collectively, the "State" or "defendants")[8] on behalf of its "constituents": individuals with mental illness as defined under 42 U.S.C. § 10802(4), who reside, or might one day reside, in specified "adult homes" in New York City.[9] Compl. ¶ 9.

---

[3] 42 U.S.C. § 10821(a) provides, in relevant part, that "[n]o allotment may be made under [PAIMI] to an eligible [P&A] system unless an application therefor is submitted to the Secretary [of Health and Human Services]."

[4] N.Y. Mental Hyg. Law § 45.07(p) grants CQCAPD the authority to "[a]dminister such protection and advocacy and client assistance programs as may be established by federal law, pursuant to such authorization or designation as may be required."

[5] 42 U.S.C. § 10804 provides, in relevant part, that "an eligible system may use its allotment under [PAIMI] to enter into contracts with State agencies and nonprofit organizations which operate throughout the State" provided that "(A) such an agency shall be independent of any agency which provides treatment or services (other than advocacy services) to individuals with mental illness; and (B) such an agency or organization shall have the capacity to protect and advocate the rights of individuals with mental illness." 42 U.S.C. § 10804(a)(1).

[6] N.Y. Mental Hyg. Law § 45.07(i) grants CQCAPD the authority to "[e]nter into contracts with any person, firm, corporation, municipality or governmental agency for the performance of functions authorized by law."

[7] Further citations to the District Court record are reflected as follows: [Name of Document], Docket No. __ (E.D.N.Y. [date]). The District Court docket sheet conforms to the original caption of the case.

[8] All individual defendants were sued in their official capacities.

6

DAI alleged that the mental health system run by the State violated the "integration mandate" of Title II of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which requires the provision of mental health services "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 CFR § 35.130(d); *see Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 607 (1999) (holding that the provision of mental health services in an institutionalized setting when the recipients are capable and willing to live in a manner more fully integrated into the community constitutes a violation of Title II of the ADA, provided that such integration can be reasonably accommodated). DAI sought declaratory and injunctive relief that would require the State to "shift[ ] residents and funds [away] from impacted [sic] adult homes to community-based residential programs" and to end "[t]he State's practice of knowingly placing and maintaining individuals with serious mental illness in impacted [sic] adult homes." Compl. ¶¶ 118, 165.

After discovery, the State brought a motion for summary judgment challenging, among other things, DAI's standing to sue on behalf of its constituents under PAIMI and Article III of the United States Constitution. The District Court denied the motion for summary judgment and rejected the standing argument, concluding that DAI had statutory standing pursuant to § 10805(a)(1)(B)[10] and satisfied the minimum requirements of constitutional standing under Article

---

[9] Adult homes are a type of privately owned, for-profit adult care facility licensed by the State of New York and authorized to provide long-term residential care, room, board, housekeeping, personal care, and supervision to five or more adults unrelated to the operator. Joint Stipulations of Fact ¶¶ 2, 17, Docket No. 260 (E.D.N.Y. April 29, 2009). Pursuant to state law, adult homes are intended to provide care for individuals who do not need the level of care provided by a hospital or nursing home but who are nonetheless "unable or substantially unable to live independently" due to disability. N.Y. Soc. Servs. Law § 2(21). It is undisputed that all of the adult homes in New York State are populated entirely by people with disabilities and/or mental illness. *Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 295 (E.D.N.Y. 2009).

[10] In relevant part, § 10805(a)(1)(B) provides: "A system established in a State under section 103 to protect and advocate the rights of individuals with mental illness shall pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State[.]" 42 U.S.C. § 10805(a)(1)(B).

III. *Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 307–10 (E.D.N.Y. 2009) ("*DAI I*"). The case then proceeded to trial.

Following a five-week bench trial, the District Court concluded that "[i]n carrying out their administration of New York's mental health service system, [d]efendants have denied thousands of individuals with mental illness in New York City the opportunity to receive services in the most integrated setting appropriate to their needs." *Disability Advocates, Inc. v. Paterson*, 653 F. Supp. 2d 184, 314 (E.D.N.Y. 2009) ("*DAI II*"). Accordingly, in a September 8, 2009 memorandum setting forth findings of fact and conclusions of law, the District Court determined that DAI had adequately "proven that [d]efendants discriminated against DAI's constituents in violation of the integration mandate of the Americans with Disabilities Act and the Rehabilitation Act." *Id.* The Court announced its intention to enter "the appropriate injunctive remedy" following further briefing. *Id.*

On October 23, 2009, more than six years after the complaint was filed, the United States moved to intervene at the remedial stage of the litigation pursuant to Rule 24 of the Federal Rules of Civil Procedure.[11] United States Motion to Intervene, Docket No. 358 (E.D.N.Y. Oct. 23, 2009). Noting that "the United States' [m]otion comes very late in the litigation process," the District Court nevertheless determined that intervention would not "prejudice the original parties or unduly delay the proceedings concerning the appropriate injunctive remedy to be imposed." *Disability Advocates, Inc. v. Paterson*, No. 03-cv-3209, 2009 WL 4506301, at *2 (E.D.N.Y. Nov. 23, 2009). Accordingly, the Court granted the United States' motion. *Id.* at *4.[12]

---

[11] Rule 24 provides, in relevant part, that intervention is *mandatory* for any party that "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a). In addition, Rule 24(b) provides for *permissive intervention* for "a federal or state governmental officer or agency . . . if a party's claim or defense is based on . . . a statute or executive order administered by the officer or agency; or . . . any regulation, order, requirement, or agreement issued or made under the statute or executive order." Fed. R. Civ. P. 24(b)(2).

[12] On December 23, 2009, the District Court denied motions to intervene by two parties asserting the interests of adult homes. *See Disability Advocates, Inc. v. Paterson*, No. 03-cv-3209, 2009 WL 5185807, at *7 (E.D.N.Y. Dec. 23, 2009). One

On March 1, 2010, the District Court rejected the State's proposed remedial plan as "unreasonable and inadequate," *Disability Advocates, Inc. v. Paterson*, No. 03-cv-3209, 2010 WL 786657, at *7 (E.D.N.Y. Mar. 1, 2010), and entered a judgment and remedial order adopting DAI's proposed remedy with minor modifications, *see* Judgment and Remedial Order, Docket No. 405 (E.D.N.Y. Mar. 1, 2010). Among other things, the remedy fashioned by the District Court required the State to ensure that, within four years of the entry of the District Court's order,

> (a) all Current Adult Home Residents who desire placement in *supported housing* have been afforded such placement if qualified, (b) all Future Adult Home Residents who desire placement in *supported housing* are promptly afforded such placement if qualified, and (c) no individual with mental illness who is qualified for supported housing is offered placement in an Adult Home unless, after being fully informed, he or she declines the opportunity to receive services in supported housing.

*Id.* at *3 (emphasis supplied).[13] Over the objection of defendants, the District Court ordered that a court-appointed monitor oversee the State's compliance with the injunctive relief imposed by the District Court. *Id.* at **8–9. By Order dated February 23, 2011, this Court granted a stay of the remedial order pending the outcome of this appeal.

---

of those movants, the New York Coalition for Quality Assisted Living ("NYCQAL"), appeals from that decision. *See* NYCQAL Br. 1. Because we conclude that DAI lacked standing to bring the original suit and the intervention of the United States was insufficient to cure that jurisdictional defect, the NYCQAL's motion to intervene is denied as moot. *See Aref v. United States*, 452 F.3d 202, 206 (2d Cir. 2006).

[13] The District Court's judgment and remedial order went on to define Current Adult Home Residents as "DAI's Constituents who are residents of an Adult Home" as of the entry of the order and Future Adult Home Residents as "DAI's Constituents who are admitted to the Adult Homes during the four-year transition period and DAI's Constituents who are admitted to the Adult Homes after the four-year transition period who desire placement in supported housing." *Id.* at *4.

"Supported Housing" refers to scattered-site residential settings "in which individuals live in their own apartment and receive services to support their success as tenants and their integration into the community." *Id.* The District Court's findings that (1) "virtually all of [DAI's] constituents are qualified to receive services in 'supported housing'"; (2) supported housing is "a far more integrated setting" than adult homes; and (3) that DAI's constituents are not opposed to receiving services in more integrated settings, served as the basis for the Court's conclusion that "DAI ha[d] established a violation of the integration mandate of the ADA and the Rehabilitation Act." *DAI II*, 653 F. Supp. 2d at 187-88.

## C. This Appeal

Defendants appeal from the March 1, 2010 judgment and remedial order of the District Court. On appeal, they argue, among other things, that the District Court erred in concluding that DAI had constitutional standing to pursue this litigation. State's Br. 74–79. Because standing is "the threshold question in every federal case" and raises an issue with respect to the Court's subject-matter jurisdiction, we turn first to that claim. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).[14] And because we conclude that DAI lacked standing and that the intervention of the United States was insufficient to cure that jurisdictional defect, we dismiss the action for want of jurisdiction.

## DISCUSSION

### A. Standard of Review

Whether a plaintiff has standing to sue is a question of law, which we review *de novo*. *See, e.g.*, *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010).

### B. Associational Standing

What constitutes the "irreducible constitutional minimum of standing" is firmly established. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The limitation on the federal judicial power under the United States Constitution to "cases" and "controversies," U.S. Const. art. III, § 2, requires that the party invoking federal jurisdiction demonstrate "(1) *injury-in-fact*, which is a 'concrete and particularized' harm to a 'legally protected interest'; (2) *causation* in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability*, or a non-speculative likelihood that the injury can be remedied by the requested relief."

---

[14] Because defendants fail to raise their objection to DAI's standing under PAIMI, *see* State's Br. 74-81, that argument is deemed abandoned, *see, e.g.*, *Major League Baseball Props. Inc. v. Salvino, Inc.*, 542 F.3d 290, 294 (2d Cir. 2008); *Hobbs v. Cnty. of Westchester*, 397 F.3d 133, 147 (2d Cir. 2005).

10

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106–07 (2d Cir. 2008) (quoting *Lujan*, 504 U.S. at 560–61).

When an association asserts standing solely as the representative of its members, it "must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). This requirement was further elaborated in *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977), in which the Supreme Court announced the current three-pronged test for "associational standing." Under *Hunt*,

> an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

432 U.S. at 343. Two decades after *Hunt*, the Supreme Court clarified that the first two of these requirements are constitutional limitations, whereas the third requirement is a "prudential limitation" that may be abrogated by Congress. *United Food & Commercial Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 557 (1996).

The *Hunt* Court concluded that the Washington State Apple Advertising Commission—a state agency charged by statute with the promotion and protection of the State's apple industry on behalf of apple growers and dealers—was not a membership organization, but it nevertheless satisfied the first prong of the associational standing test because "in a very real sense . . . the Commission represent[ed] the State's growers and dealers and provide[d] the means by which they express[ed] their collective views and protect[ed] their collective interests." *Id.* at 344–45. Furthermore, the apple growers and dealers "alone elect[ed] the members of the Commission; they

11

alone [could] serve on the Commission; they alone finance[d] its activities, including the costs of [litigating *Hunt*], through assessments levied upon them." *Id.*

In sum, the Supreme Court reasoned that, although the Commission did not have "members" in the "traditional" sense, its "constituency" possessed "all the indicia of membership." *Id.* We have therefore recognized that—assuming the other criteria for associational standing are met—non-membership organizations may sue in a representative capacity when they "function[ ] effectively as a membership organization." *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 196 (2d Cir. 2000).

On the threshold jurisdictional question of standing, the only dispute is whether DAI— which is not a membership organization—satisfies the first prong of the test for associational standing under *Hunt*. Defendants argue that DAI cannot meet this requirement (*i.e.* that its members would otherwise have standing to sue in their own right) because DAI's constituents lack two key indicia of membership: representation and control. In turn, DAI and the United States contend that *Hunt* does not render representation and control the only indicia of membership sufficient to create "members" out of "constituents" for purposes of associational standing.

Pursuant to PAIMI, P&A systems must ensure that they are responsive to the needs of the community they were created to represent. Accordingly, the governing board of all P&A systems must be "composed of . . . members . . . who broadly represent or are knowledgeable about the needs of the clients served by the system"; such members are defined to include "individuals who have received or are receiving mental health services and family members of such individuals." 42 U.S.C. § 10805(c)(1)(B). In addition, a P&A system must:

> establish an advisory council . . . which shall include . . . individuals who have received or are receiving mental health services, and family members of such individuals, and at least 60 percent the membership of which shall be comprised of individuals who have received or are receiving mental health services or who are family members of such

12

> individuals; and . . . which shall be chaired by an individual who has
> received or who is receiving mental health services or is a family
> member of such an individual.

*Id.* § 10805(a)(6)(B-C). Finally, PAIMI also requires that P&A systems establish a grievance procedure for clients or prospective clients to "assure that individuals with mental illness have full access to the services of the system." *Id.* § 10805(a)(9).

Whether these protections are sufficient to connote the "indicia of membership" required for associational standing under *Hunt* has not heretofore been addressed in this Circuit. Some, but not all, courts of appeals to address the question have concluded that they are sufficient. *See Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1110 (9th Cir. 2003) (concluding that the "constituents" of Oregon's P&A system "possess many indicia of membership—enough to satisfy the purposes that undergird the concept of associational standing: that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'" (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977))); *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (concluding that the requirements under § 10805 ensure that "[m]uch like members of a traditional association, the constituents of the [P&A system] possess the means to influence the priorities and activities the [system] undertakes"); *but see Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994) (concluding that Texas's P&A system bore "no relationship to [a] traditional membership group[ ], because most of its 'clients' . . . are unable to participate in and guide the organization's efforts"); *Mo. Prot. & Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 810 (8th Cir. 2007) (concluding same with respect to Missouri's P&A system).

We need not—and do not—decide which of our sister circuits has the better of this argument, because DAI is not a P&A *system* but a *contractor* to the system, *see* notes 5–6, *ante*, designated to provide protection and advocacy services under PAIMI. Zucker Aff. ¶ 6. This

13

distinction is critical to the question of whether DAI has associational standing because the sole basis cited in both *Stincer* (Eleventh Circuit) and *Mink* (Ninth Circuit) for finding that P&A systems have associational standing to sue on behalf of individuals with mental illness is that § 10805 affords individuals with mental illness (and their families and representatives) the requisite "indicia of membership" in the administration of the system.

The District Court did not consider whether DAI is subject to any of the statutory requirements under § 10805 such that it might satisfy the constitutional requirements for standing under *Hunt*. More importantly, however, DAI does not claim that its constituents have a sufficiently active affiliation with the organization. *Cf. Hunt*, 532 U.S. at 344–45 (recognizing that the apple growers and dealers "alone elect the members of the Commission; they alone may serve on the Commission; [and] they alone finance its activities"). Tellingly, there is scant evidence in the record that the individuals with mental illness whom DAI purports to represent have the power to elect its directors, make budget decisions, or influence DAI's activities or litigation strategies. For instance, the record does not contain the contract between CQCAPD and DAI. Nor does it contain agendas, minutes, or other evidence regarding the quarterly meetings between DAI and CQCAPD's Advisory Council; names and descriptions of the members of the Advisory Council; or ways that individuals with mental illness convey information, requests, or inquiries to the Advisory Council. Finally, the record does not establish that DAI ever notified its "constituents" or any of their legal guardians that it was filing this suit purportedly on their behalf. Accordingly, DAI has failed to satisfy its burden of establishing the elements of its purported associational standing. *Lujan*, 504 U.S. at 561.

To the extent DAI relies on District Court cases in this Circuit for the proposition that contractors have associational standing to sue on behalf of individuals with mental illness, those cases are inapposite in one of two ways. First, cases that have recognized the associational standing of non-membership organizations have almost exclusively concerned P&A *systems* rather than P&A

14

*contractors* such as DAI. *See, e.g., State of Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 281–83 (D. Conn. 2010). Second, those cases that have recognized the distinction between systems and contractors of systems have elided the constitutional dimensions of associational standing entirely. *See, e.g., Rubenstein v. Benedictine Hosp.*, 790 F. Supp. 396 (N.D.N.Y. 1992). They are therefore of little value to DAI and the United States in this case, which turns entirely on whether DAI meets the constitutional threshold for associational standing set forth by the Supreme Court.

*Hunt* held that the Constitution requires that the constituents of a non-membership organization manifest the "indicia of membership" for that organization to have associational standing to sue on their behalf. On the record before us, DAI has established that CQCAPD, New York's P&A system, is bound by the statutory requirements of § 10805, but we can find no support for the proposition that DAI itself is subject to those requirements or has adopted the same statutory protections. Without those protections, there is no evidence that the individuals with mental illness on behalf of whom DAI brought this case have anything approaching the indicia of membership that is required under *Hunt*, much less that DAI "function[s] effectively as a membership organization." *See In re Holocaust Litig.*, 225 F.3d at 196. We therefore hold that DAI has failed to satisfy the constitutional requirements for associational standing prescribed by the Supreme Court in *Hunt* and its progeny.[15]

---

[15] Our holding does not stand for the proposition that all organizations contracted to provide protection and advocacy within a P&A system necessarily lack standing. We do not reach the question of whether some such contractors can fulfill the statutory requirements under § 10805 and meet the constitutional threshold established under *Hunt*. We hold simply that, in the circumstances presented here, DAI has not met its burden to establish constitutional standing.

We reject the argument that merely because DAI lacks standing to assert this claim on its own, it cannot fulfill its legislative responsibility to "pursue . . . legal . . . remedies to ensure the protection of individuals with mental illness." 28 U.S.C. § 10805(a)(1)(B); *see* United States Br. 66. In circumstances where P&A contractors cannot bring suits "in their own right" because of constitutional standing requirements, they may provide representation to individuals with mental illness and litigate those cases in the names of those individuals. That contractors such as DAI must satisfy the minimum requirements of constitutional standing does not foreclose access to the federal courts for those organizations or the individuals whose interests they are intended to serve.

## C. Intervention

The United States argues that even if DAI lacks standing to pursue this claim, the intervention of the United States after the completion of the liability phase of the case is sufficient to permit the case to move forward. *See* United States Br. 77–80. We disagree.

We have long recognized that "'if jurisdiction is lacking at the commencement of [a] suit, it cannot be aided by the intervention of a [plaintiff] with a sufficient claim.'" *Pressroom Unions-Printers League Income Sec. Fund v. Cont'l Assurance Co.*, 700 F.2d 889, 893 (2d Cir. 1983) ("*Pressroom*") (quoting *Pianta v. H.M. Reich Co.*, 77 F.2d 888, 890 (2d Cir. 1935)) (brackets in original); *see also* 7C C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1917, at 457 (3d ed. 2005) ("Intervention cannot cure any jurisdictional defect that would have barred the federal court from hearing the original action." ). This is no casual observation; our recognition that "[t]he right to intervene presupposes an action duly brought," *Pianta*, 77 F.2d at 890, reflects the Supreme Court's long-held understanding that where a "cause of action ha[s] not accrued to the [party] who undertook to bring the suit originally . . . . intervention [can]not cure th[e] vice in the original suit." *U.S. ex rel. Tex. Portland Cement Co. v. McCord,* 233 U.S. 157, 163–64 (1911); *accord Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 95 (2d Cir. 1990) ("[I]t is fundamental that an intervening claim cannot confer subject matter jurisdiction over the action it seeks to join.").

---

Indeed, as the District Court observed, citing one of plaintiff's own experts, "some of the current and former Adult Home residents who testified in this case engage in advocacy on behalf of Adult Home residents—they lobby State government, participate in rallies, and attend meetings of advocacy organizations for individuals with mental illness." *DAI II*, 653 F. Supp. 2d at 216. One witness testified that "he went to Albany five times to lobby for an [i]ncrease of spending allowance, clothing allowance, better medical and mental conditions, air conditioners in the room and housing." *Id.* at 216 n.207 (quotation marks omitted). As one of the *amici* explained, "the vast majority of adult-home residents are not severely impaired," and "93% had no-to-mild impairment of their overall cognitive skills . . . ." Am. Ass'n of Cmty. Psychiatrists Br. 18. This evidence supports the conclusion that most of the individuals on behalf of whom DAI advocates were not precluded, by virtue of their mental illness, from either exercising some degree of control over an organization that purports to represent their legal interests or, as appears to be the norm in DAI's own protection and advocacy litigation, participating alongside DAI as plaintiffs (either in their own names or using initials or "John Doe").

16

The logic that underlies this rule is clear enough. Intervention is a procedural means for entering an existing federal action. *See Canatella v. California*, 404 F.3d 1106, 1113 (9th Cir. 2005). The Federal Rules of Civil Procedure "do not extend or limit the jurisdiction of the district courts." Fed R. Civ. P. 82. That is, Rule 24 does not itself provide a basis for jurisdiction. Accordingly, "since intervention contemplates an existing suit in a court of competent jurisdiction and because intervention is ancillary to the main cause of action, intervention will not be permitted to breathe life into a 'nonexistent' law suit." *Fuller v. Volk*, 351 F.2d 323, 328 (3d Cir. 1965). Indeed, this rule is so deeply entrenched in our jurisprudence that it is an axiomatic principle of federal jurisdiction in every circuit to have addressed the question. *See, e.g., Hofheimer v. McIntee*, 179 F.2d 789, 792 (7th Cir. 1950) ("An existing suit within the court's jurisdiction is a prerequisite of an intervention, which is an ancillary proceeding in an already instituted suit.") (quotation marks omitted); *see also Canatella*, 404 F.3d at 1113 ("Because Rule 24 cannot extend federal jurisdiction[,] . . . intervention as of right cannot be used to circumvent *Younger* [*v. Harris*, 401 U.S. 31 (1971)] abstention."); *Black v. Cent. Motor Lines, Inc.*, 500 F.2d 407, 408 (4th Cir. 1974) ("By its very nature intervention presupposes pendency of an action in a court of competent jurisdiction."); *Kendrick v. Kendrick*, 16 F.2d 744, 745 (5th Cir. 1926) (explaining that an existing lawsuit within the court's jurisdiction is a prerequisite of intervention); *Brictsom Mfg. Co. v. Woodrough*, 284 F. 484, 487 (8th Cir. 1922) (same).

In *Hackner v. Guar. Trust Co.*, 117 F.2d 95 (2d Cir. 1941), we recognized a district court's discretion to treat the pleading of an intervenor as a separate action in order to adjudicate the claims raised by the intervenor even if the underlying claim was jurisdictionally deficient. There, plaintiffs sought to amend the complaint by substituting one party for two others *twenty two days* after the complaint was filed and before any action by the defendants had been taken. Rather than start again, we distinguished *Pianta* and its progeny and permitted the suit to proceed because the intervention had occurred before any action by the defendants had been taken. *Id.* at 99. As Judge

17

Charles E. Clark, the chief architect of the Federal Rules of Civil Procedure, noted, "whether the matter is treated as one of amendment . . . or of commencement of a new action," the action can continue "without the delay and expense of a new suit, which at long last will merely bring the parties to the point where they now are." *Id.* Since *Hackner*, this prudential approach has found favor in other courts. *See, e.g., Miller & Miller Auctioneers, Inc. v. G.W. Murphy Indus., Inc.*, 472 F.2d 893, 895 (10th Cir. 1973).

Unlike in *Hackner*, however, the United States intervened in this case *after the trial had concluded*. Permitting this case to continue would allow the *Hackner* exception (that curative interventions be construed as separate actions when they are effected at the beginning of the proceedings) to swallow the clearly established constitutional rule that intervention cannot cure any jurisdictional defect that would have barred the federal court from hearing the original action.

The fact that the United States adopted in its complaint the findings of fact and conclusions of law of the District Court does not justify the conclusion that we should exercise our discretion to permit this case to proceed. The relevant question under *Hackner* is not whether the curative intervenor is prepared to take the case "as he finds it" for the sake of judicial economy, but rather, whether he entered sufficiently early in the litigation to ensure that parties "invok[ing] the court's jurisdiction have 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions.'" *Duke Power Co. v. Carolina Envtl. Study Grp.*, 438 U.S. 59, 72 (1978) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). In this case, the District Court decided important questions of fact and law based entirely on the presentation of a plaintiff who

lacked standing. The fact that the United States later "adopted" those findings and conclusions cannot remedy the absence of jurisdiction at trial and in pretrial proceedings.[16]

In sum, we conclude that because "[t]he right to intervene presupposes an action duly brought," *Pianta*, 77 F.2d at 890, the intervention of the United States six years into this litigation and after the conclusion of a trial on liability, was not sufficient to cure the defect in the District Court's jurisdiction when it entered its findings of fact and conclusions of law on the merits.[17]

\*    \*    \*

If a plaintiff lacks standing, the federal "courts have no business deciding [the case], or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340–41 (2006). Because we agree with defendants that DAI does not have standing and that the intervention of the United States was insufficient to cure that jurisdictional defect, we vacate the judgment and remedial order of the District Court and dismiss the action for want of jurisdiction.

In reaching this conclusion, we are mindful of the possibility that this litigation will continue, inasmuch as the United States—whose standing is not disputed—has represented that, in the event of a dismissal on the basis of standing, it would re-file the action and submit the same evidence at a subsequent trial. Individual plaintiffs with standing could, of course, pursue further litigation as well, either in conjunction DAI or on their own. We are not unsympathetic to the concern that our disposition will delay the resolution of this controversy and impose substantial burdens and

---

[16] The United States also suggests that *Mullaney v. Anderson*, 342 U.S. 415 (1952), provides a basis for avoiding dismissal of this case. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 834 n.8 (1989) (noting that, in *Mullaney*, "[t]he addition of the union members was considered necessary to establish the existence of a justiciable case"); *cf. Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1381–82 (Fed. Cir. 2000); *Cal. Credit Union League v. City of Anaheim*, 190 F.3d 997, 999, 1001 (9th Cir. 1999). But *Mullaney* did not address *U.S. ex rel. Tex. Portland Cement Co. v. McCord,* 233 U.S. 157 (1911), or the continuing vitality of the basic rule that intervention cannot cure a jurisdictionally deficient suit. We are not inclined to conclude that the Supreme Court intended *sub silientio* to abrogate a basic feature of constitutional standing. If we have misunderstood the requirements of Article III, we rest with confidence that higher authority stands ready to correct us.

[17] Because we conclude that the intervention of the United States does not permit the case to proceed in the absence of proper jurisdiction at the commencement of the suit, we need not consider defendants' arguments on the merits.

transaction costs on the parties, their counsel, and the courts. Should that situation arise, we are confident that the experienced and able district judge, as a consequence of his familiarity with prior proceedings, can devise ways to lessen those burdens and facilitate an appropriate, efficient resolution.

Although we are not presently required to consider the issue of remedy, we do have concerns about the scope of the proposed remedy. If this controversy continues, and if the renewed litigation reaches the remedial phase, the parties and the District Court will have another opportunity to consider an appropriate remedy.

## Conclusion

To summarize, we conclude that:

(1) DAI lacks standing under Article III of the United States Constitution to bring this suit because it failed to demonstrate that that its constituents possess the "indicia of membership" necessary for a non-membership organization to exercise associational standing. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

(2) The intervention of the United States after the complaint, discovery, disposition of motions for summary judgment, trial and the entry of the District Court's findings of facts and conclusions of law with respect to plaintiff's claims on the merits was insufficient to cure the jurisdictional defect in the case as brought.

The District Court's March 1, 2010 judgment and remedial order is therefore **VACATED** and the action is **DISMISSED** for lack of jurisdiction.

Each party shall bear its own costs.